## SETH H. BUTLER *vs.* THE AMERICAN TOY COMPANY.

The firm of *S & Co*, engaged in the business of making toys, formed a copartnership with the firm of *B & Co*. engaged in the same business, for the sale of their goods in New York, under the name of the American Toy Company. Afterwards, in consequence of the death of a member of the firm of *S & Co.*, the remaining members, with the widow and minor children of the deceased member, procured an act making them a corporation; the preamble stating that the late firm had for many years been engaged in the manufacture of skates, toys, tools, and other articles of wood or metal, that it had a large amount of real and personal estate used in the business, that the business was profitable and that it was for the interest of all concerned that it should not be discontinued, and that the act of incorporation was sought for the purpose of enabling the petitioners to carry on the business of the late firm; and the act providing that the corporation should have power to carry on the manufacture of skates, toys, tools, and other articles of wood or metal, and engage in trade in connection therewith, and that the property of the firm should become vested in the corporation. The business of the firm and its transactions with the Toy Company had been the same after the death of the deceased member, and were continued in the same manner by the corporation. Held that the charter of the corporation by necessary intendment authorized it to take the place of the firm as a member of the Toy Company, and that it had become such a member. (Two judges dissenting.)

By the articles of copartnership between the two firms each was to be allowed to draw on the Toy Company to the amount of three-fourths of the price of goods sent to it for sale. Drafts were drawn by *B. & Co*. upon and accepted by the Toy Company to a greater amount, and were discounted by the plaintiff. These drafts were endorsed by *S*, who was a stockholder, and had until a short time before been a director of the corporation. The plaintiff knew the provisions of the articles of copartnership, but did not know that the drafts were in excess of the authorized amount. The fact of this excess appeared only on the books of the Toy Company in New York, while the

plaintiff resided in this state. The plaintiff knew, however, that the drafts were discounted for the benefit of *B & Co.*, and that they were greatly in need of money. Held that these facts were not sufficient to put the plaintiff on inquiry as to whether the corporation considered itself liable on the acceptances of the Toy Company.

The business of the firm of *S & Co.* having been continued after the death of one of its members precisely as before, the representatives of the deceased member taking the benefit of his interest, the firm was not to be regarded as dissolved by his death.

An action upon the common count for money lent will lie against an acceptor of a draft in favor of a party who has discounted it.

ASSUMPSIT for money lent and advanced; brought to the Superior Court in Middlesex County. The defendants were described in the writ as "The American Toy Company, a partnership doing business in this state and in the city of New York, and consisting of The J. & E. Stevens Company, a corporation duly organized and established and located in the town of Cromwell in this state, and George W. Brown & Company, another partnership, consisting of George W. Brown, of Bristol, and Mrs. Julia T. Goodrich, of Plainville, in this state, a married woman, but doing business in her own name and for the benefit of her separate estate, partners." The defendants pleaded the general issue, with notice among other things that they should show that the J. & E. Stevens Company was not and never had been and had no power to be a member of the defendant partnership. The issue was closed to the court and the following facts found:

On the 12th day of February, 1867, the American Toy Company was formed by the following instrument in writing:

"Articles of agreement made the 12th day of February, 1867, by and between the firm of J. & E. Stevens & Company, consisting of John Stevens, Elisha Stevens, Joseph M. Waters, and Russell Frisbie, of Cromwell, Middlesex County, Conn., on the first part, and the firm of George W. Brown & Company, consisting of George W. Brown, of Bristol, and Julia T. Goodrich, of Farmington, Hartford County, Conn., on the second part—witnesses that the said firm of J. & E. Stevens & Company and said firm of George W. Brown & Company have agreed, and by these presents do agree, to become co-partners together in hiring and conducting a store

in the city and state of New York, for the purpose of carry-
ing on a wholesale and retail toy and general merchandizing
business, and hereby agree and establish the following rules
for the government of the co-partnership, viz:

" 1st.   The business shall be conducted under and by the
name of the American Toy Company.

" 2d.   The said party of the first part do agree to sell to
said American Toy Company goods of their manufacture in
such quantities as may be wanted or required for sale in said
store.   And the said party of the second part agree to sell
said American Toy Company goods of their manufacture in
such quantities as may be wanted or required for sale in said
store, and each of said parties agree to devote so much of
their personal time and service as may be necessary to carry-
ing out the business of this co-partnership.

" 3d.   The books and accounts of the company shall be
kept in a good, plain, and legible manner, and at all times be
subject to the inspection of each and all the parties interested
in this co-partnership.   Each of the parties may be allowed
to make drafts on this company for any amount not exceeding
three-fourths the amount of goods sent and invoices received
from said party.   And the said American Toy Company shall
be obligated to accept such drafts, and if at the maturity of
the draft or drafts there be a sufficient amount of the goods
received from the party making the draft sold to meet the
same, then the American Toy Company shall pay the draft,
but if a sufficient amount are not sold then the draft shall be
renewed at the expense of the party making the same.

"An account of the stock and liabilities of the company
shall be taken on or about the first day of January, each and
every year, and at the expiration of this partnership term.
This co-partnership shall commence on the 12th day of Feb-
ruary, 1867, and continue for the term of one year.   The
expenses of the store and other incidental expenses shall be
borne equally by the parties to this instrument.   The profits
arising from the business of the company shall be divided in
the same manner.   When any losses shall occur to the com-
pany by reason of any default of the parties purchasing
goods, each party to this instrument shall bear the loss in

proportion to the amount of their goods upon which such loss may occur.

"At the final closing up of this co-partnership each of the two parties hereby agree to purchase of the American Toy Company all the goods of their manufacture which this company may have on hand at said time, and to pay or allow for the same the prices at which the goods were invoiced to the company.   (Signed,)

> Geo. W. Brown & Co.
> J. & E. Stevens & Co.
> John S. Stevens.
> Russell Frisbie.
> Joseph M. Waters.
> Elisha Stevens."

At the time of the making of this agreement J. & E. Stevens & Company were a co-partnership, and consisted of the said John Stevens, Russell Frisbie, Joseph M. Waters, and Elisha Stevens, and were engaged in the manufacture of toys in said Cromwell, and the said Geo. W. Brown & Co. were at that time also a co-partnership, and engaged in the same business at Forestville in Hartford County.

After the making of the agreement the parties thereto hired a store, No. 17 Park Place, in the city of New York, and commenced business under the name of "The American Toy Company," and carried on the same in accordance with the agreement until the 17th day of December, 1868, when the said Joseph M. Waters died intestate, leaving a widow, Sarah E. Waters, and three minor children, Charles E. Waters, Julia S. Waters, and Mary E. Waters.

After the death of Waters no change was made in the name of J. & E. Stevens & Company, and none made in their business until the May session of the General Assembly, 1869, when a resolution was passed incorporating "The J. & E. Stevens Company."   The following is the preamble of the resolution:

"It having been shown to this General Assembly that John Stevens, Elisha Stevens, Russell Frisbie, and Joseph M. Waters, of Cromwell, in this state, were for many years, prior to the 17th day of December, 1868, partners in business

in the manufacture of hardware, skates, toys, tools, and other articles of wood or metal at said Cromwell, under the name of J. & E. Stevens & Co., and that the said Joseph M. Waters died intestate on the 17th day of December, 1868, leaving a widow, Sarah E. Waters, and three minor children, Charles E. Waters, Julia S. Waters, and Mary S. Waters; and that said firm of J. & E. Stevens & Co. were at the time of the death of said Joseph M. Waters possessed of a large amount of real and personal estate used in their said business, of which they were joint and equal owners, which business was profitable, and the continuance of which will be greatly for the interest of the heirs of said Joseph M. Waters, and its discontinuance or serious interruption greatly for the injury of all parties in interest; and said John Stevens, Elisha Stevens, Russell Frisbie, and Sarah E. Waters, having united in a petition to this General Assembly for an act incorporating said John Stevens, Elisha Stevens, Russell Frisbie, and the widow and heirs of said Joseph M. Waters, for the purpose of carrying on said business of said late firm, therefore, resolved, &c."

The resolution then provided that John Stevens, Elisha Stevens, Russell Frisbie, Sarah E. Waters, Charles E. Waters, Julia S. Waters, and Mary E. Waters, be associated as a corporation under the above name, " with power to engage in and carry on the manufacture of hardware, skates, toys, tools, and other articles of wood or metal, and for the purpose of trade in connection therewith," and that " the whole real and personal estate of the said late firm of J. & E. Stevens & Company is hereby transferred to and vested in said corporation of the J. & E. Stevens Company, and shall constitute the capital stock of such corporation." It was also provided that the stock was to be held in shares, of which the par value should be $100, and the whole value of the capital stock was estimated at $140,000, and was to be held by the corporators as follows: John Stevens, Elisha Stevens, and Russell Frisbie three hundred and fifty shares each, Sarah E. Waters one hundred and nineteen shares, and Charles E. Waters, Julia S. Waters, and Mary S. Waters seventy-seven shares each. It also provided that the stock should be personal property

and transferable on the books of the company, and that the guardians of the minors be "empowered to execute transfers of the shares of their wards and vote on the stock of such wards at all meetings of the corporation."

Sarah E. Waters before the passage of the resolution had been legally appointed guardian of the minors. The corporation was duly organized under the resolution and the stock was apportioned according to its provisions and certificates duly issued, and Sarah E. Waters and the minors are still the holders and owners of the stock, except that she has sold and transferred seventeen shares of her own stock and seventeen shares of each of the minors' stock, and transferred the latter as guardian.

No deed or conveyance was made by J. & E. Stevens & Co. to the corporation, and the real and personal estate of the co-partnership, if it vested at all in the corporation, was vested by virtue of the resolution. A part of the assets of the co-partnership at the time of the formation of said corporation consisted of an interest in the American Toy Company.

After the death of Waters and up to the time of the organization of the corporation, no change was made in the American Toy Company, the business being conducted in the same manner, so far as J. & E. Stevens & Co. were concerned. After the organization of the corporation, the business of the Toy Company was conducted in the same manner as under the original agreement, and the only change in the name of the parties composing the Toy Company was, that instead of "J. & E. Stevens & Co." appearing on the bill and letterheads of the Toy Company, the name of "The J. & E. Stevens Company" was used; and from 1871 to 1873 the business of the Toy Company was carried on by the J. & E. Stevens Company and G. W. Brown & Company substantially in the same manner as under the original agreement, except that in 1871 the J. & E. Stevens Company had a special agent in the New York store to look after their interest, and some different arrangement was made in relation to the rent of the store; and also some time in the year 1871 or 1872 the Stevens & Brown Manufacturing Company, a joint stock corporation, composed of Elisha Stevens, George W. Brown

others, became interested in the American Toy Company as partners, and by an arrangement between the Stevens & Brown Manufacturing Company and the J. & E. Stevens Company, assented to by G. W. Brown & Co., the Stevens & Brown Manufacturing Company thereafter assumed the share of the profits and losses of the American Toy Company which had previously belonged to the J. & E. Stevens Company, and the names of the Stevens & Brown Manufacturing Company and the J. & E. Stevens Company with the names of G. W. Brown & Co., appeared upon the bill and letter-heads used by the Toy Company; but up to March 5th, 1873, there was no apparent change in the business of the Toy Company.

On the 5th of March, 1873, the following notice of the dissolution of the American Toy Company was signed and published:

"Notice is hereby given that the J. & E. Stevens Company, of Cromwell, Conn., has withdrawn from the firm of the American Toy Company, No. 17 Park Place, New York, having disposed of their entire interest in said American Toy Company to the Stevens & Brown Manufacturing Company and George W. Brown & Company, on whose account the business will hereafter be conducted. William F. Brown is authorized to sign all checks and other papers necessary in liquidation of the accounts of the old firm. New York, March 5th, 1873.

THE J. & E. STEVENS COMPANY,

By JOHN STEVENS, *President.*

THE STEVENS & BROWN MANUFACTURING COMPANY,

By ELISHA STEVENS, *President.*

GEO. W. BROWN & CO.

"The undersigned call your attention to the above and solicit your patronage as heretofore. The goods manufactured by G. W. Brown & Co., the J. & E. Stevens Company, and the Stevens & Brown Manufacturing Company, will be sold by the undersigned under the firm name of the American Toy Company.

GEO. W. BROWN & CO.

THE STEVENS & BROWN MANUFACTURING COMPANY."

The above notice was published March 10th, 1873, in the New York Times, but was inserted only once, and no other public notice was given of the withdrawal of the J. & E. Stevens Company from the Toy Company.

Some time in 1870 George W. Brown and Elisha Stevens applied to the plaintiff, Seth H. Butler, to discount the drafts of G. W. Brown & Co. upon the American Toy Company, and the plaintiff acceded to the request and commenced discounting such drafts. The drafts were made by G. W. Brown & Co., payable to their order and accepted by the American Toy Company, and were endorsed by G. W. Brown & Co. and by Elisha Stevens, the acceptances being made by William F. Brown, as attorney, who was duly authorized to make such acceptances.

The plaintiff continued to discount these acceptances till some time in 1874, when the Toy Company went into bankruptcy. There was no regular line of discounts; the amount varied from time to time, and on the 5th of March, 1873, the plaintiff held $16,500 of them.

The plaintiff had no notice of the withdrawal of the J. & E. Stevens Company from the Toy Company till February, 1874, and the plaintiff discounted the drafts up to this time, believing that the J. & E. Stevens Company was a partner in the Toy Company.

After February, 1874, all the drafts discounted by the plaintiff were renewals of drafts discounted before that time, and the plaintiff was assured by George W. Brown, and by William F. Brown, the attorney of the Toy Company, that the latter had authority to renew the acceptances and that the old firm of the American Toy Company would still be liable on such renewed acceptances.

The plaintiff knew what the original contract was constituting the American Toy Company, and knew of the death of Waters, and of the incorporation of the J. & E. Stevens Company, and also knew that Elisha Stevens was one of the members and a director up to 1873 of the J. & E. Stevens Company and of the Stevens & Brown Manufacturing Company, and he made no inquiry of any other member of the

J. & E. Stevens Company as to their liability on the American Toy Company's acceptances. The acceptances were all made for the benefit of G. W. Brown & Co., who were credited on the Toy Company's books with their avails; the drafts appeared in no other manner on the books of the Toy Company, but they all appeared on the books of G. W. Brown & Co. The drafts by G. W. Brown & Co. were generally in excess of three-fourths of the goods sent by them to the Toy Company, and at the time of the failure of the company were largely in excess of that amount, but it did not appear that the plaintiff knew that they at any time had overdrawn their account, unless that fact is to be inferred from the manner the discounts were obtained by George W. Brown, who stated when obtaining the same that the firm was greatly in need of funds, and the fact that G. W. Brown & Co. submitted to heavy discounts in order to obtain the money on the drafts, and in many instances twenty per cent. discount and expenses were charged by the plaintiff and paid by them, and the fact that during all this time the J. & E. Stevens Company was perfectly sound, and their paper could be readily discounted at ordinary bank rates.

At the time the plaintiff brought this suit the American Toy Company, George W. Brown & Co , and the Stevens & Brown Manufacturing Company, were each insolvent, and the only responsible party connected with the Toy Company was the J. & E. Stevens Company.

Upon these facts the case was reserved for the advice of this court. It was argued at a former term of the court and re-argued at the present term by direction of the judges.

*A. P. Hyde* and *A. B. Calef*, for the plaintiff.

*H. C. Robinson* and *S. L. Warner*, for the defendants.

PARK, C. J. The great question in this case is, whether the charter of the J. & E. Stevens Company by necessary intendment authorized that corporation to continue the business of the American Toy Company as it was then conducted, and had been conducted from its organization. If it gave

this authority, and the business was so continued, then it will be clear that the J. & E. Stevens Company were bound by the acts of the American Toy Company to the same extent precisely as the J. & E. Stevens Company had been previously bound; and the case will be the same that it would have been if Waters had not died and the partnership of J. & E. Stevens & Co. had continued.

It matters but little in the consideration of this question that the partnership of J. & E. Stevens & Co. was technically dissolved on the death of Waters, for the business of the firm was continued by the surviving partners in all respects as it had been, not with a view of winding up its affairs, but to prosecute the business as before. The manufacturing went on just as it had done; goods continued to be sent to the Toy Company for sale, and sales were made, and drafts were drawn and paid as before; indeed the death of Waters worked no change whatever in the management and operations of the company. The business was prosperous, and any break in its management would work injuriously to all concerned. Hence the surviving partners continued the business, using the interest of the deceased partner for the benefit of his widow and heirs, intending, no doubt, at the earliest opportunity to apply, as they did in fact apply, to the legislature for a charter, in the meantime carrying along the business and using the property of the firm until a corporation could be organized, bridging over the interval in the best manner they were able. This state of things might perhaps be regarded as the formation of a temporary partnership among the surviving partners to accomplish the object they had in view. But however it may be considered, there was no dissolution of the partnership in fact. *Duffield* v. *Brainard*, 45 Conn., 424. The legislature so considered it, for in the preamble of the charter which was subsequently granted, after speaking of the business of the firm and the condition it was in, they go on to say, "which business was profitable, and the continuance of which will be greatly for the interest of the heirs, * * and its discontinuance or serious interruption greatly for the injury of all parties in interest." Would this language have

been used if the business of the firm was then discontinued, or had been seriously interrupted for a number of months? We think it is clear there was no dissolution of the firm in fact, no discontinuance of its operations, no interruption of its business; and the case must therefore be considered just as it would have been if Waters had not died until after the organization of the corporation.

We will next consider what the object of the surviving partners and the widow of the deceased partner was, in asking the legislature to turn the partnership into a corporation. This is shown by the preamble already referred to, which goes on to say substantially, that the petitioners have made it appear to the legislature that the business of the firm was prosperous, that one of the partners had died leaving a widow and children, that a discontinuance or serious interruption of the business would be disastrous to all concerned, that in order to prevent such a discontinuance or interruption, and to enable the widow and children to share in the profits of the business, the surviving partners and widow petition the General Assembly for an act of incorporation "for the purpose of carrying on the business of the late firm." Here the object of the petitioners is clearly manifested. They never intended and never asked that the business should be curtailed by the proposed act of incorporation, or the manner of carrying it on changed in any particular. The business was prosperous as it was, and its prosperity may have largely come from the mode in which they disposed of their goods through the Toy Company. The object they had in view is further shown by the fact that after the corporation was organized no change was made in the business in any respect. Goods continued to be sent to the Toy Company for sale, according to the terms of the original partnership, and drafts were drawn and paid by the Toy Company precisely as they always had been, thereby showing that the petitioners never intended that the act of incorporation should work any change whatever in the business, and supposed that it had not. They construed the act to mean nothing more and nothing less than a change of the partnership into a corporation, leaving the

business to be conducted as it had before been. Any other view of their conduct would lay them open to the charge of fraud. If they intended ostensibly to carry on the business of the Toy Company as a partner, reap its benefits, and avoid its responsibilities, on the ground that it was beyond their charter powers, their conduct was grossly dishonest. We see nothing in the case tending to such a result, and we therefore give them credit for honesty in their dealings with the legislature, and in their conduct afterwards, and say that they never intended that the Toy Company should be dissolved by the act of incorporation, and that they never supposed that it had been done, and never made such a claim until the exigencies of the present suit required it. Indeed, after continuing the business of the Toy Company for a number of years after the charter was granted, they formally withdrew from the company as a partner and established an agency to settle its affairs. This conclusively shows that up to the present controversy, the J. & E. Stevens Company regarded themselves as a partner in the Toy Company.

We come now to the important question in the case, whether or not the legislature, by the act of incorporation, granted the prayer of the petitioners, that the business, which had been up to that time profitable, might be continued as it was then conducted and had been previously conducted.

The defendants strenuously contend that the petitioners were merely incorporated to manufacture and sell their goods without any reference to the business of the firm as it had been conducted. If so, why did the legislature recite the substance of the petition in the preamble of the act? It says, "It having been shown to this General Assembly that [the petitioners] were for many years partners in business, &c., * * which business was profitable, and the continuance of which will be greatly for the interest of the heirs, and its discontinuance or serious interruption greatly for the injury of all parties in interest: * * Therefore resolved, &c." The preamble of a resolution is always important to be considered in giving a construction to the resolution, for in the preamble the legislature states the rea-

sons which induce its action. Here the business of the late firm is referred to as a whole—the business of the firm in all its parts. If it does not mean this, what part of the business was it that would be profitable to have continued? That part of it carried on by the Toy Company may have been the chief source of their prosperity. For aught that appears the company had no other mode of selling their goods. Shall that be excluded? We might as well strike out the preamble altogether as throwing no light on the resolution in controversy, which would be contrary to all rules. The legislature say that they were informed of the nature and character of the business, and knew how it was carried on, else they could not have said that it had been shown to them that the business was profitable and should be continued. In the second section of the act of incorporation all the property of the late firm, both real and personal, is transferred to and vested in the corporation as their capital stock. The defendants claim that only the property of the late firm existing at the time of the death of Waters was so transferred. If so, what became of the goods that were manufactured after the death of Waters and before the act of incorporation? What became of the choses in action that were received from sales, the stock that was purchased, the drafts that were drawn and not paid in the meantime? In the preamble, as we have already seen, the legislature speak of the business of the late firm as continuing, as existing. If so then the property used in the business was the property of the firm then existing. The business is called the business of the firm, and the property is called the property of the firm, for it could not have been called by any other name. In the circumstances it all belonged to the firm. The surviving partners could have kept nothing out, for they openly and avowedly professed to be carrying on the business of the firm after the death of Waters just as before. If large profits had been made, the widow and heirs would have been entitled to their share. If the firm had been wound up when the act of incorporation was passed, inasmuch as it was solvent, it would have been wound up as of that date, if the interest of the heirs so

required. No one was interested in the matter but the parties interested in the profits and property, and as among themselves all the property then existing in the business belonged to the firm if it was for the interest of the heirs so to consider it.

We think, therefore, that the act of incorporation transferred to the J. & E. Stevens Company all the property then existing and belonging to the firm, as it would have done if Waters had then been alive; and we think further, that the act authorized the corporation to continue the business as it was then conducted, and to continue the Toy Company as a part of the business. We have come to this conclusion after carefully considering all the facts of the case, and the objections raised by the defendants, which are of a technical character. We can discover nothing which could have induced the legislature to do otherwise. The petitioners requested it to be done. The business was profitable as it was being conducted. The Toy Company was but little more than an agency established for the sale of their goods. It existed at the will of the partners. It would be in the power of the corporation to dissolve it at any time when it ceased to be profitable. There was nothing in the articles of agreement under which the company was organized which was of an objectionable character. It is said that the company was engaged in a general merchandizing business. But it will be found, on inspection of their articles of agreement, that the business was confined to the sale of the goods manufactured by the partners. No provision was made for the purchase of any other goods. These considerations no doubt had their effect upon the legislature, and induced them to authorize the continuance of the Toy Company.

The defendants further claim that the plaintiff cannot recover on the common count of his declaration. But this question was long ago settled in this state in favor of that form of action. *Eagle Bank* v. *Smith*, 5 Conn., 71; *Farmers & Citizens' Bank* v. *Payne*, 25 Conn., 444.

It appears in the case that the drafts drawn by George W. Brown & Co. on the Toy Company, which were discounted by

the plaintiff, were generally in excess of three-fourths of the invoiced price of the goods sent by that company to the Toy Company, and when the latter company failed they were largely in excess.   It appears farther that the plaintiff knew what the articles of agreement which governed the partnership were, and also knew of the incorporation of the J. & E. Stevens Company, and that the drafts and acceptances were all made for the benefit of George W. Brown & Co., which company was greatly in need of funds, and in many instances paid the plaintiff twenty per cent. for his discounts of the drafts.   But the case finds that it did not appear that the plaintiff knew that George W. Brown & Co. had at any time overdrawn their account, unless the fact is to be inferred from the manner in which the discounts were obtained.   The defendants insist that these facts were sufficient to put the plaintiff upon enquiry of the J. & E. Stevens Company whether they considered themselves liable on the acceptances of the Toy Company, and having failed to do so he cannot recover.   It appears that the discounts were made at Middletown in this state, where the plaintiff resided, and that the Toy Company was located in the city of New York.   Hence the plaintiff could not ascertain whether George W. Brown & Co. had overdrawn their account except by an examination of the books of the Toy Company in New York.   The plaintiff knew that those books were at all times open to the inspection of the J. & E. Stevens Company, and having had no notice of the withdrawal of that corporation from the Toy Company, he would naturally suppose that they knew the condition of the books, and knew how many drafts and to what amount George W. Brown & Co. had drawn on the Toy Company.   And the plaintiff farther knew that Elisha Stevens, who endorsed all the drafts, was a stockholder, and up to 1873 was a director of the J. & E. Stevens Company.   The drafts were all drawn on the Toy Company in the usual way, and were accepted by that company in the usual manner.   These facts would naturally destroy any suspicion that might be awakened by the fact that George W. Brown & Co. were greatly in need of funds, and were willing to pay large pre-

miums for discounts. It is a matter of history that in these days many wealthy firms everywhere were in the same condition. We think this claim cannot prevail.

We leave the question undecided whether the J. & E. Stevens Company would have been bound by the facts of the case, if their charter had not by necessary intendment authorized the continuance of the Toy Company.

We advise judgment for the plaintiff.

In this opinion PARDEE and GRANGER, Js., concurred; CARPENTER and LOOMIS, Js., dissented.

LOOMIS, J. The opinion of the majority of the court recognizes the correctness of the proposition that the J. & E. Stevens Company, after its incorporation under the act of 1869, could not become a partner in the American Toy Company unless expressly or impliedly authorized by the provisions of that act. While heartily assenting to the truth of the premises, I totally dissent from the conclusion. I know of no recognized rules of interpretation that can extract from the charter any authority to form such a partnership as is referred to. The fact that the charter specifies with unusual particularity the business which the corporation is to engage in, would seem to settle the question. The language is—"with power to engage in and carry on the manufacture of hardware, skates, toys, tools, and other articles of wood or metal; and for the purpose of trade in connection therewith.    *    *    Said corporation to be located at said Cromwell, in the county of Middlesex in this state." Private Acts of 1869, p. 7, sec. 1. The business is characterized only as *manufacturing*. But as the goods manufactured must be sold to effectuate the object of making them, the power is added "to trade in connection therewith." This can only be construed as a trade conducted by the corporation and confined to the articles allowed to be manufactured, and not as authorizing the formation of a partnership to conduct "a wholesale and retail toy and general merchandizing business." Suppose it had been a joint stock corporation located in Cromwell, and its articles of association had specified the business precisely as above, would it

not seem preposterous for a lawyer to advise them that they could go beyond the limits of this state and join other parties not mentioned in a general merchandizing partnership? But the same construction would necessarily be given to the same language.

The authority to become a partner is nowhere expressed or even faintly intimated in the charter or in the preamble. Is such a power implied? If so, it must be from some language contained in the charter, or must be derived from those incidental powers that are necessary for the purpose of carrying into effect powers that are expressly granted.

At the very threshold of the inquiry after implied powers we are confronted with the fact that the purposes and business of the corporation are particularly specified, which brings the case within "the sound principle that the specific grant of certain powers in a charter, is an implied prohibition of other and distinct powers." *Firemen Insurance Co.* v. *Ely*, 5 Conn., 572.

But for the purposes of this discussion I am willing to ignore even this fundamental and elementary principle, and give a liberal construction to every part of the act.

Great reliance is placed by a majority of the court upon the preamble. It is claimed to confer an authority on the corporation to continue the business of the late firm in all particulars as they found it. It seems to me otherwise. The business is not left to be determined by extrinsic evidence, but is particularly specified. And in this respect the language of the preamble is just as explicit as that of the act itself. The business of the J. & E. Stevens Company is first specified in the same language used in the act, and afterwards in every instance where there is any reference to the business the words are "said business." And where it speaks of the continuance of the business as one of the objects of the incorporation, it is referred to as "said business of the late firm, &c.," which for purposes of construction is equivalent to repeating the language first used.

But had the word "said" been omitted in the reference, the fair construction would refer it to the business which had

been mentioned. And even a general expression of a purpose to continue their business refers by necessary intendment to their business proper and its incidents, rather than to some particular mode or accidental contract they may have adopted. The business was manufacturing certain articles. The power to sell them would be necessarily incidental; but the mode of selling through a partnership contract with persons not mentioned would not be a *necessary incident,* but rather a mere *accident* of their former business.

But it is further said that the reason given to the legislature in favor of an act of incorporation was to prevent the interruption of a profitable business, and therefore, it is argued, they must have intended to continue the partnership contract with George W. Brown & Company. This seems to me a *non-sequitur,* especially when the business to be interrupted is specified, and no mention is made of anything else. And besides, regard must also be had to the nature of the interruption feared. This was such an one as the death of a partner would occasion—a total dissolution of the firm and consequent apportionment of the assets, not a trifling interruption, resulting from the termination of the contract referred to, and possibly a change in the mode of selling their goods. This change was just as easy on the adoption of the charter as when afterwards made in March, 1873, and doubtless it would have been far better to have made it then. The argument drawn from the provision in the act transferring all the property of the late firm to the corporation, loses its force when we keep in mind the legal distinction between the property owned independently by the J. & E. Stevens Company as a distinct partnership, and that which they owned in another partnership with George W. Brown & Co. The former could have been conveyed by the J. & E. Stevens Company by description as tangible property, but the latter only as an interest or right resulting from a final settlement of the affairs of the Toy Company. And there is surely no presumption that the legislature intended to vest it in any other way except as it might have been transferred by the firm as an existing partnership.

Again, as the purpose of the incorporation was to extricate the concern from the perils and inconveniences of one partnership, it seems the more incredible that the legislature should have intended to subject it to similar perils in another nowhere named or referred to in any of the proceedings.

And not only is the power to form a partnership unnecessary in order to carry into effect the powers expressly granted, but it will be found inconsistent with the powers so granted. The provisions putting the entire management in the hands of seven directors, chosen by and from among the stockholders, and requiring regular returns of the pecuniary condition, it seems to me are liable to be practically nullified if one who happens to be merely a partner in the Toy Company is allowed to secretly appropriate the whole or any part of its assets in the management, or mismanagement, as the case may be, of "a wholesale and retail toy and general merchandizing business," located far away from the corporation.

In passing, I may here notice a remark in the opinion of the court that there was nothing objectionable in the articles of agreement of the Toy Company, because those articles confined the business to the sale of goods actually manufactured by the partners. The articles however did not necessarily so confine it, and it does not appear that in fact it was so confined. Under their articles they could have purchased additional toys anywhere else, or any other article of merchandize.

The plaintiff in his supplemental brief, in replying to the defendants' objection that the Toy Company had no power to accept the drafts in question because the limitation had been exceeded, says:—"The copartnership was formed for the purpose of hiring and conducting a store in the city of New York for the purpose of carrying on a wholesale and retail toy and general merchandizing business. It is true that it is provided that each partner shall have the right to draw drafts to a certain amount which the Toy Company shall be obligated to accept, but not a word is said in those articles which prohibits the company from giving notes or accepting drafts as might be required in carrying on the general merchandizing business."

The fact that this corporation did engage in this partnership I apprehend may have had undue weight with the court in construing the charter in question. But this fact has no legitimate place in the discussion if by all the rules of construction the act done is not within either the express or implied powers of the corporation. The doing of the act in itself can never authorize or sanction it. If it could, the doctrine of *ultra vires* would be unknown. And for the same reason the doctrine of estoppel can never apply to an act not within the scope of the powers of a corporation to perform under any circumstances and for any purposes. I know it sometimes seems hard to see a contract with a third party stricken down by the unrelenting application of this principle, but nevertheless it is perfectly clear that the doctrine of *ultra vires* is founded upon a wise, necessary, and even beneficent, public policy. Without it, every corporation could defy the sovereign power that created it, and engage in any business or speculation lawful for a natural person to an unlimited extent, and non-assenting stockholders, who have practically no control over the management, and creditors, would be greatly injured. The doctrine in special instances may be wrongfully applied or carried too far, and I would be liberal in conceding to a corporation all necessary incidental powers auxiliary to its main business, but I can scarcely imagine anything more objectionable or hostile to chartered privileges, or more dangerous to the interests of stockholders and creditors, than to allow a corporation to be launched on the uncertain, dangerous, and limitless sea of partnership responsibility.

In this opinion CARPENTER, J., concurred.

[NOTE.—The foregoing case was argued at an adjourned term of the court at which Judge GRANGER was present, though not present at the regular term.]